Case 6:23-cv-00004-NKM-JCH   Document 94   Filed 12/06/24   Page 1 of 20
Pageid#: 671

CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
12/6/2024
LAURA A. AUSTIN, CLERK
BY: s/ CARMEN AMOS
      DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| EDWARD I. WHITMORE,<br><br>*Plaintiff,*<br><br>v.<br><br>KROGER LIMITED PARTNERSHIP I,<br><br>*Defendant.* | CASE NO. 6:23-CV-00004<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Plaintiff Edward Whitmore sues Defendant Kroger Limited Partnership for negligence. In his complaint, Whitmore alleges that he was shopping in the dairy aisle of a Kroger grocery store when a Kroger employee hit his shopping cart with a pallet jack, pinning Whitmore between his shopping cart and the dairy shelving unit—causing him serious harm. After Kroger made several unsuccessful attempts to dismiss Whitmore's *pro se* suit, Whitmore retained counsel and both parties engaged in discovery. Now before the Court is Whitmore's motion for sanctions or, alternatively, default judgment. *See* Dkt. 77 (motion); Dkt. 78 (brief in support).

Whitmore principally argues that Kroger failed to preserve material evidence—namely, video surveillance footage of the alleged incident—and that Kroger's failure to preserve the video footage warrants either (i) spoliation sanctions under Federal Rule of Civil Procedure 37(e), such as a jury instruction that that the jury must or may presume the lost evidence was unfavorable to Kroger, or, (ii) default judgment in favor of Whitmore.

Upon consideration of Whitmore's motion and the parties' arguments, the Court finds

that spoliation has occurred and is prejudicial to Whitmore, warranting sanctions. However, the Court is not persuaded that Kroger acted intentionally to spoil the evidence, or that Kroger practiced fraud upon the Court so as to warrant default judgment in Whitmore's favor. Therefore, in an order that will accompany this memorandum opinion, and for the reasons stated below, the Court will **GRANT** Whitmore's Motion for Sanctions, **Dkt. 77**, to the extent that the Court will instruct the jury at trial that it may presume the lost evidence was unfavorable to Kroger. The Court **DENIES** Whitmore's motion to the extent that it requests greater sanctions.

## I. Background

### A. Amended Complaint

In his amended complaint, Whitmore alleges that he was a customer shopping in the dairy aisle of a Lexington-area Kroger sometime between 9:40pm and 10:10pm on December 17, 2020. Dkt. 57 at 2. (Kroger does not deny this. *See* Dkt. 58 at 1-2.) Whitmore alleges that a Kroger employee Trudy Keefe negligently "hit [Whitmore's] shopping cart with a pallet full of milk while she was operating a pallet jack," pinning Whitmore "between his shopping cart and the dairy shelving unit, crushing his foot and otherwise injuring him." Dkt. 57 at 2. Whitmore avers that he "reported the incident to Gretchen [Curlis], the on-duty supervisor, at the front of the store" that same evening. Dkt. 57 at 2. Finally, Whitmore alleges that Kroger is vicariously liable under *respondeat superior* for Keefe's negligent conduct. Dkt. 57 at 2. Whitmore seeks $500,000 in damages and demands trial by jury. Dkt. 57 at 2-3.

### B. Discovery Evidence of the Alleged Incident

#### 1. *Whitmore's Version*

According to Plaintiff, Whitmore went to the Lexington-area Kroger on the evening of

December 17, 2020, with the intent to "fill [his] shopping cart." Dkt. 80-1 at 6. One item he sought was milk. Dkt. 80-1 at 6. He also kept in mind his son Joseph's request to get a special treat: a flavored milk product called "Private Selection Strawberries and Cream." Dkt. 80-1 at 6. However, Whitmore had not promised Joseph to get the treat; he said he would read the label. Dkt. 80-1 at 6. Whitmore reads labels closely because he and his family experience various allergies and he "[tries] to be healthy." Dkt. 80-1 at 7-8.

At the store, Whitmore "became familiar with the label." Dkt. 80-1 at 6. No one else was around. Dkt. 80-1 at 9. Whitmore believes he stood there in the milk aisle, reading labels, for approximately "two to five" minutes. Dkt. 80-1 at 7. During this time, Whitmore's shopping cart was faced "toward[] the dairy double doors," while Whitmore's eyesight was "focused on the dairy cooler itself." Dkt. 80-1 at 10-11. He was "practically touching the refrigerator section—[he] was as close as you could get . . . [w]ith it being an open refrigerator area . . . kind of just [a] reach in" refrigerator unit—when Whitmore saw a Kroger employee, Trudy Keefe, make a ninety degree turn in his direction while pulling a pallet jack. Dkt. 80-1 at 18-19. Keefe's back was to Whitmore as she pulled the pallet jack toward him. Dkt. 80-1 at 19. The pallet jack "hit the front right corner" of Whitmore's cart, pinning his leg against the refrigerator section, while the back wheel of the shopping cart rolled on top of his foot, breaking it. Dkt. 80-1 at 21.

Now allegedly "in terrible shock," Whitmore "ceased shopping" and proceeded to purchase the few items he had in his cart via self-checkout. Dkt. 80-1 at 12, 27. He "would have liked to have [gone to] the ER," but he did not have his phone with him and he did not ask anyone to call an ambulance. Dkt. 80-1 at 27. Before leaving the store that evening, Whitmore spoke to an employee, Gretchen Curlis, about the incident. *See* Dkt. 78-11. Whitmore announced

3

to Curlis "that he was going to sue Kroger." Dkt. 78-6 at 2 (Meet and Confer Letter).[1]

Several days later, on December 23, 2020, Whitmore completed a customer incident form. *See* Dkt. 78-11. The form indicated that an incident occurred on December 17, 2020 at 10:05PM in Kroger's "whole milk aisle." *Id*. On the form, Whitmore stated as follows:

> I was beside the Krogers brand of gallon jugs of whole milk facing the milk shelf when contact was made with the moving pallet jack. . . . A tall wheeled-moving pallet made forceful contact with my shopping cart moving the cart into multiple areas of my body. The employee replied upon making contact, "I am so sorry hun, I did not know you were there." I ceased shopping and told Gretchen, an employee. She advised me to call management, which I called MA Wright on 12/18. I have convalesced at home and gone to doctors and ER for condition.

*See* Dkt. 78-11.

### 2. *Trudy Keefe's and Kroger's Version*

Trudy Keefe described a very different version of events in her deposition. She stated as follows:

> I was working in the dairy [department], and I was fixing to come out of the swinging doors, not of the dairy cooler, but of the dairy area . . . . There's a door on my cooler, and then there's these swinging doors. As I was getting ready to come out of the swinging doors, I always step out. No matter what time I'm working, I step out, make sure there's nobody around if I'm fixing to haul out a pallet. . . . I looked around. There was nobody there. So I commenced coming out with my pallet, pulling it, because it was a Homestead milk heavy pallet . . . . And as I started coming out, I turned my pallet . . . to come around the corner . . . . And as I did, I heard a voice say, "I'm behind you."
>
> I stopped, and it was [Whitmore] in one of those little, I call them hover rounds . . . the little electric thing that the older people ride with the basket . . . a motorized scooter.
>
> I waited for him to do whatever it was he was going to do or get,

---

[1] *See* Dkt. 78-6 at 2 (Meet and Confer Letter) ("With regard to the assertions of privilege as stated, Plaintiff announced to Ms. Curlis on the night of the alleged incident that he was going to sue Kroger. Therefore, we would the position that any statements taken or materials prepared after that evening, or in anticipation of litigation.").

> and then he left. [He left] on the buggy.
>
> [Later that evening,] Gretchen [Curlis], from up front, called me and asked me to come up front. . . . [S]he told me what he had said, that he told her that I ran into him with the pallet.
>
> [Keefe responded:] 'No, I did not him. . . . I didn't hit him at all.'

Dkt. 80-3 at 5-7 (Keefe Deposition).

At some point the next day, or the next day that she worked, Keefe met with Gina Harrison in asset protection to discuss the accident. Dkt. 80-3 at 7. Gina Harrison oversaw "the cameras" and security. Dkt. 80-3 at 7. Harrison, however, does not recall this meeting. Dkt. 80-6 at 11-12.

On January 6, 2021, Keefe also filled out an accident report, as she was directed to do by her manager, Aubrey Wright. On the form, Keefe states:

> I was coming out of [the] dairy cooler and before I came through the swinging doors, I stopped and looked to make sure there was not anyone on the other side of the doors or on the floor in the direction I was going. There was no one there (it was almost closing time) so I proceeded, as moving I kept looking back and no one was in my sight. Then within a few seconds someone said hello. Now mind you this was a pallet of Homestead Creamery milks in glass jars. The pallet was stacked as tall as me if not higher. This is not a pallet you can move quickly, very heavy.

Dkt. 80-2 at 5 (Witness Statement Form, full statement).

### C. Kroger's Response

#### 1. *Background on Security and Asset Protection at Kroger*

"As of 17 December 2020, Gina Harrison was responsible for loss-prevention cameras in the East Nelson Street Kroger in Lexington." Dkt. 78-1 at 5. Harrison began working in asset protection for Kroger in 2013, and she is responsible for capturing store video for eight stores, including the relevant store in Lexington. *See* Dkt. 80-6 at 1-3. She testified that across these

5

eight stores, on average, she accesses store video footage three to four times per week for theft events and three to four times each month for customer injury events. *See* Dkt. 80-6 at 1-3.

At the relevant Lexington-area Kroger, there were roughly 32 cameras capturing the premises at the time of the incident. Dkt. 80-6 at 4. Given this number of cameras, store manager Wright states that it would be impossible for Whitmore to "make it from his car to the milk aisle" without being seen on "any camera." Dkt. 78-3 at 4. Whitmore "should have been picked up on at least one to two, maybe even more cameras . . . [d]epending on the route he took through the store." Dkt. 78-3 at 4-5.

### 2. *Reporting Protocol*

Based on the exhibits provided, Kroger's asset protection process is not entirely clear to the Court. What follows is the Court's estimation based on the relevant discovery evidence.

Generally, if an incident is reported to an employee, "the employee should [] notify the store management team immediately of such incident." Dkt. 80-7 at 6 (Wigand Deposition). Store managers have "a packet of documents that they would fill out to gather the necessary detail of the incident, one of which would be a statement that the customer who was injured can also fill out and express their side of the story at that point. *Id*. At that point, the documents are "reviewed and sent in to a third party" called Sedgwick. *Id*. Sedgwick then "holds onto those documents and processes claims." *Id*.

"Once [management has] done the accident report and called it in to Sedgwick, they would ask us [the Asset Protection team] to review video and burn a disc." Dkt. 78-8 at 6 (Harrison Deposition). "[I]t's usually Kroger's protocol that if they cannot locate the incident on camera, [] they preserve camera footage from nearby cameras and also of the customer entering

6

and exiting the store." Dkt. 78-3 at 10 (Wright Deposition).[2]

However, at the time of the incident, protocol was slightly different: "Back then, [Kroger] did not burn video all the time for an accident." Dkt. 78-8 at 5-6. Instead, "management . . . would send a video submission form" to Sedgwick. Dkt. 78-8 at 6. Sedgwick would then act as a "sort of a middleman" and relay the request to Kroger Mid-Atlantic. Dkt. 78-8 at 6.

### 3. *Reporting and Preservation of Footage of the Alleged Incident*

In any case, Kroger concedes that, based on the alleged incident, its protocols should have been triggered to preserve some video of the store during the relevant hours.[3] Harrison testified that store manager Wright apparently submitted a video request form to Sedgwick. Dkt. 78-8 at 10. Claim notes from Sedgwick indicate that a claim was indeed started on December 23, 2020. *See* Dkt. 78-9 at 1. The notes show several communications to from Sedgwick to Kroger requesting video evidence. Dkt. 78-9 at 10-16. The notes indicate that Kroger employees stated that "there is no video where this occurred" but that they "still need to secure video of the closest camera." Dkt. 78-9 at 8. The notes also indicate that, as of January 27, 2022, "the store [had] not sent in any video evidence." *Id*. at 7. Harrison is unaware of whether any requests were submitted to Kroger Mid-Atlantic. Dkt. 78-8 at 10. However, Kroger Mid-Atlantic "could have pulled the video" itself without Sedgwick's involvement. Dkt. 78-8 at 13. "As long as it's within the 30-day mark, you can retrieve any of the in-store camera [footage]," regardless of any actions taken by Sedgwick. Dkt. 80-6 at 6-7.

---

[2] *See also* Dkt. 78-7 at 8 (Wigand Deposition) ("If camera footage does not show the area where a claimed incident took place, Kroger usually preserves nearby cameras and video of the customer entering and exiting the store.").

[3] "[I]t's reasonable that one tasked with preserving footage ensures that he or she is preserving the correct footage." Dkt. 78-7 at 8 (Deposition of Paul Wigand). "[V]ideo footage of the correct time frame should have been preserved." *Id*. If that was done in this case, "it sounds like it was not done at the appropriate time." *Id*. Wright states "If [Whitmore] says he's next to the whole milk and he gets hit by a pallet jack and you have video camera at that time showing no such thing occurred, that would be helpful video to preserve." Dkt. 78-3 at 9-10 (Wright Deposition).

Ultimately, "Kroger loss prevention employees captured some video footage of the general dairy area; however, the employees inadvertently captured video from 9am - 10am on the day of the alleged incident." Dkt. 78-1 at 1-2.[4] Apparently explaining this inadvertence, Harrison testified that it would be "very unusual" for Trudy Keefe to be working at night, since she normally worked day shifts. Dkt. 80-6 at 13-14. If someone directed Harrison to "pull some footage from [Keefe's] shift on December 17 . . . around 10," Harrison would have "pulled from day shift." Dkt. 80-6 at 14.

### 4. Discovery Motions

Whitmore now moves for sanctions under Federal Rule of Civil Procedure 37(e), or, alternatively, default judgment based on the submission of false evidence. *See* Dkt. 78 at 1. It is Kroger's position that Whitmore's "cart or buggy, whatever it was, was never struck by a pallet of milk maneuvered by an employee." Dkt. 78-3 at 5.

## II. Legal Standard

### A. Rule 37(e) Spoliation of Evidence

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) (citations omitted). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Id*. "[S]poliation is not a substantive claim or defense but a 'rule of

---

[4] Whitmore, similarly, argues that Kroger "failed to preserve any camera footage whatsoever during the relevant times and, instead, preserved footage from thirteen hours earlier that day, and only from the dairy camera." Dkt. 78 at 7-8.

evidence,' and thus is 'administered at the discretion of the trial court.'" *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004) (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995)).

Although spoliation is governed by both the Federal Rules of Civil Procedure and the inherent authority possessed by federal courts, *see Silvestri*, 271 F.3d at 590, the Supreme Court promulgated Rule 37(e) in 2015 after recognizing "the serious problems resulting from the continued exponential growth" in the volume of ESI. *See* Fed. R. Civ. P. 37(e) (advisory committee's note to 2015 amendment). As such, Rule 37(e) essentially "forecloses reliance on inherent authority or state law to determine when certain measures should be used," *id.*, and it "significantly limits a court's discretion to impose sanctions for loss or destruction of ESI." *Jenkins v. Woody*, No. 3:15CV355, 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017). The rule, accordingly, "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify those measures." Fed. R. Civ. P. 37(e) (advisory committee's note to 2015 amendment).

Rule 37(e) in its current form provides as follows:

> **(e) Failure to Preserve Electronically Stored Information.**
> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > **(A)** presume that the lost information was unfavorable to

9

>   the party;
>
>   **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or
>
>   **(C)** dismiss the action or enter a default judgment.

*See* Fed. R. Civ. P. 37(e).

In other words, Rule 37(e) operates in two parts: it first establishes four threshold elements to determine whether spoliation of ESI has occurred, and it next sets forth possible sanctions for spoliation, should it be found to exist.

As to the threshold elements, spoliation has occurred where (1) ESI should have been preserved in the anticipation or conduct of litigation; (2) it was lost; (3) the loss occurred because a party failed to take reasonable steps to preserve it; and (4) it cannot be restored or replaced through additional discovery. *Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.*, No. 6:20-CV-54, 2022 WL 518910, at *2 (W.D. Va. Feb. 18, 2022); *see also Butler v. Kroger Ltd. P'ship I*, No. 2:19CV673, 2020 WL 7483447, at *7 (E.D. Va. Nov. 30, 2020), *report and recommendation adopted*, No. 2:19CV673, 2020 WL 7482186 (E.D. Va. Dec. 18, 2020). "The movant has the burden of proving all [four of the predicate] elements of Rule 37(e)." *Emerson Creek Pottery*, 2022 WL 518910, at *2.

If a movant satisfies the threshold requirements for establishing that spoliation occurred, the court must determine whether sanctions are appropriate. *Whitten v. Johnson*, No. 7:19-CV-00728, 2022 WL 885773 (W.D. Va. Mar. 25, 2022), *affirmed*, No. 23-6304, 2024 WL 1366780 (4th Cir. Apr. 1, 2024). Under Rule 37(e), the court has two options: "First, upon finding **prejudice** to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice." *Id*. (cleaned up). "Second, and 'only upon finding that the party acted with the **intent** to deprive another party of the information's use in the

10

litigation,' the court may presume that the lost information was unfavorable to the party who lost it, instruct the jury that it may or must so presume, or dismiss the action or enter a default judgment." *Id*. (quoting Fed. R. Civ. P. 37(e)(2)).

"Although Rule 37(e) clearly announces the required showings, that of prejudice or intent to deprive, determining whether a scenario meets those standards lacks certitude." *Knight v. Boehringer Ingelheim Pharm., Inc.*, 323 F. Supp. 3d 837, 845 (S.D.W.Va. 2018). As to prejudice, no precise standard has been announced, but, generally, "courts find prejudice when spoliation compromises a party's ability to present its case." *Id*. As to the finding of an "intent to deprive," the Fourth Circuit has not provided guidance regarding the level of intent required. *Knight*, 323 F. Supp. 3d at 845 (citing *Jenkins v. Woody*, No. 3:15CV355, 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017) ("The United States Court of Appeals for the Fourth Circuit has not yet decided the burden of proof in sanctions cases.")). In any case, even assuming that a movant satisfies its burden, and a court makes one of the two prerequisite findings, "a court is not required to impose sanctions." *Knight*, 323 F. Supp. 3d at 845 (citing *BMG Rights Mgt. LLC v. Cox Commun., Inc.*, 199 F. Supp. 3d 958 (E.D. Va. 2016), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018)).

### B. Default Judgment for Deceptive Conduct

Courts possess the "inherent authority and discretion to sanction a litigant who acts in 'bad faith, vexatiously, wantonly, or for oppressive reasons,' including when a party practices a fraud upon the court or disrupts litigation." *See AMF Bowling Centers, Inc. v. Tanase*, No. 3:23-CV-448–HEH, 2024 WL 2978775, at *12 (E.D. Va. June 13, 2024) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)). A court's discretion in this realm extends from the "particularly severe sanction" of "outright dismissal of a lawsuit," to the "less severe" sanction

11

of an "assessment of attorney's fees." *See Chambers*, 501 U.S. at 44-45.

As to outright dismissal of a lawsuit, courts in the Fourth Circuit are justified in exercising this sanction especially "[w]hen a party deceives a court or abuses the [judicial] process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). "Submitting false or fabricated evidence is the most egregious misconduct which justifies a finding of fraud upon the Court." *Salgam v. Adv. Software Sys., Inc.*, No. 1:18-cv-29 (AJT/TCB), 2020 WL 6322857, at *4 (E.D. Va. July 2, 2020) (citation omitted), *aff'd*, 2023 WL 5165275 (4th Cir. Aug. 11, 2023).

However, "[m]indful of the strong policy that cases be decided on the merits, and that dismissal without deciding the merits is the most extreme sanction," courts in the Fourth Circuit must exercise their inherent power to dismiss "with restraint" and only after considering the following factors:

> (1) the degree of the wrongdoer's culpability;
> (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients;
> (3) the prejudice to the judicial process and the administration of justice;
> (4) the prejudice to the victim;
> (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and
> (6) the public interest.

*Shaffer Equipment*, 11 F.3d at 462-63.

### III. Discussion

Whitmore argues that the Court should impose sanctions upon Kroger under Federal Rule of Civil Procedure 37(e) for failing to preserve the video footage, or, alternatively, award

Whitmore default judgment based on Kroger's submission of false evidence. *See* Dkt. 78 at 1.

Based upon the evidence presented and the parties' arguments, the Court finds that Whitmore has met his burden to show that Kroger failed to preserve ESI evidence which is now irretrievable—the lack of which prejudices his case—thereby warranting sanctions under Rule 37(e)(1). However, the Court does not find that the evidence proves Kroger *intentionally* failed to preserve the video footage, per Rule 37(e)(2). Nor does the Court find that Kroger has acted deceptively, so as to warrant default judgment in Whitmore's favor.

### A. Spoliation under Rule 37(e)

As noted above, spoliation requires that the movant show both that spoliation occurred and that sanctions are warranted. Here, the Court finds that Kroger's failure to preserve any video footage from the relevant timeframe amounts to the loss of evidence which is prejudicial to Whitmore's case and therefore requires the Court impose sanctions which are no greater than necessary to cure the prejudice.

#### 1. Spoliation Has Occurred

Kroger concedes that two of the four threshold elements are satisfied: (i) ESI—in the form of video footage—was lost, and (ii) the ESI cannot be restored or replaced through additional discovery. *See* Dkt. 80 at 11. Thus, the Court must only consider the remaining elements: whether the video footage should have been preserved in anticipation of litigation, and whether Kroger's failure to preserve the footage was reasonable. *See Emerson Creek Pottery*, 2022 WL 518910, at *2.[5] The Court also considers Kroger's argument that "it is unclear whether

---

[5] Spoliation has occurred where (1) ESI should have been preserved in anticipation of litigation; (2) it was lost; (3) the loss occurred because a party failed to take reasonable steps to preserve it; and (4) it cannot be restored or replaced through additional discovery. *Emerson Creek Pottery, Inc. v. Emerson Creek Events, Inc.*, No. 6:20-CV-54, 2022 WL 518910, at *2 (W.D. Va. Feb. 18, 2022).

13

Plaintiff's alleged accident would have been captured by the video camera generally closest to the Kroger dairy area." Dkt. 80 at 12.

First, the video footage should have been preserved in anticipation of litigation both because Kroger was on notice that Whitmore intended to sue and because the video footage would have been relevant to the case and. Kroger disputes whether the video camera closest to the alleged incident would have actually captured the incident, due to the camera's view being obstructed by other shelving units in the store. Indeed, the depositions reveal substantial uncertainty about the viewpoints of the camera and the layout of the store—which have changed in the four years since the incident. Nonetheless, Whitmore correctly argues that whether the dairy camera captured all of Whitmore, only the top of his head, or none of Whitmore, is beside the point. Kroger did not manage to capture *any* video footage from *any* of the 32 cameras at the store during the relevant timeframe. Into this void, Kroger injects uncertainty by disputing whether Whitmore used a shopping cart at all, instead suggesting that he was on a motorized scooter[6]—which, if true, undermines not only Whitmore's story but also the potential for his injury, since the injury allegedly came from the cart that he used. Given this alternative version of events, any footage of Whitmore walking, carting, or motoring around the store that evening would have potentially laid claim or waste to some or all of the parties' competing narratives. Also relevant would have been footage of Trudy Keefe pulling a seven-foot-tall pallet of milk, demonstrating the manner in which she operated the dairy tower, whether negligently or not; footage of Whitmore proceeding through self-checkout and reporting the incident to Curlis, in "terrible shock;" or footage of Whitmore leaving the store after the incident, with an apparently

---

[6] "I stopped, and it was [Whitmore] in one of those little, I call them hover rounds . . . the little electric thing that the older people ride with the basket . . . a motorized scooter. I waited for him to do whatever it was he was going to do or get, and then he left. [He left] on the buggy." Dkt. 80-3 at 5-7 (Keefe Deposition).

14

broken foot. The video footage of the store during the correct timeframe was hyper-relevant, such that it should be preserved in case litigation arose. And Kroger was on notice that litigation would in fact arise: Whitmore announced to Curlis, that evening, "that he was going to sue Kroger." Dkt. 78-6 at 2 (Meet and Confer Letter). These factors show that Kroger should have preserved the video footage in anticipation of litigation.

Second, Kroger failed to take reasonable steps to preserve the video footage. Kroger argues that "pulling and preserving store video when incidents occur is an internal policy," that Whitmore never requested that video be pulled, and that Whitmore failed to answer letters from Sedgwick. Dkt. 80 at 11-12. However, Whitmore had already announced his intention to sue. Kroger's responsibility to preserve the video footage was not contingent upon Whitmore's letters. Though Kroger's protocol for "asset protection" and video capture appears complex (*i.e.*, shared between individual stores, regional management centers, and a claims-processing company), Kroger's "inadvertent" failure to preserve the appropriate footage is still a failure which should not have occurred given the normal operation of its systems. Its responsibility cannot be abdicated to Sedgwick, Whitmore, or any other party. And nor is it an excuse to have captured the wrong timeframe based upon as thin a reed as Trudy Keefe normally working day shifts. Such a correlation should not trump Kroger's detailed, if convoluted, protocols for asset protection. Thus, Kroger failed to take reasonable steps to preserve the video footage.

Accordingly, Whitmore has fulfilled the threshold elements to show that spoliation occurred: The video footage should have been preserved in anticipation of litigation, but due to Kroger's failure to take reasonable steps to preserve it, the footage was irretrievably lost.

    2. **Sanctions for Spoliation**

Now that Whitmore has established that spoliation occurred, the Court must determine

15

whether sanctions are appropriate. *Whitten v. Johnson*, No. 7:19-CV-00728, 2022 WL 885773 (W.D. Va. Mar. 25, 2022). Under Rule 37(e), the Court has two options: "First, upon finding **prejudice** to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice." *Id*. (cleaned up). "Second, and 'only upon finding that the party acted with the **intent** to deprive another party of the information's use in the litigation,' the court may presume that the lost information was unfavorable to the party who lost it, instruct the jury that it may or must so presume, or dismiss the action or enter a default judgment." *Id*. (quoting Fed. R. Civ. P. 37(e)(2)).

Kroger argues that Whitmore cannot be prejudiced by the loss of the video because Kroger is "equally" prejudiced. Dkt. 80 at 12. Furthermore, Kroger argues that "even if Kroger's camera captured the alleged incident, there is no evidence the footage was intentionally omitted or otherwise destroyed." Dkt. 80 at 10. The Court is only partially persuaded.

Whitmore is unquestionably prejudiced by the lack of video evidence in this case. As alluded to above, Kroger's potential arguments at trial include disputing (i) whether Whitmore was using a push-style shopping cart or a motorized cart; (ii) whether contact was made with such a cart; and/or (iii) whether Keefe was reasonable in her operation of the pallet. Without video evidence, these disputes largely boil down to witness testimony and credibility contests. And unfortunately for Whitmore, he has scarcely a witness from the store to support his version of events: "There was no one there (it was almost closing time)." Dkt. 80-2 at 5 (Keefe Deposition). At trial, it is Whitmore's word versus the word of Keefe, Wright, Curlis, Harrison, and others. In this light, Whitmore is severely prejudiced by Kroger's failure to preserve any video footage of the store's premises from the relevant timeframe.

The Court does not find, however, that Kroger intentionally spoiled the evidence.

16

Whitmore observes that "it is hard to imagine a scenario where such *mens rea* evidence would come to light." Dkt. 78 at 11. This may be true, but it must come to light. Only evidence of Kroger's *mens rea* would allow the Court to impose harsher sanctions. However, instead of a clearly guilty mind, the evidence mostly suggests that Kroger had a disorganized and ineffective mechanism for reporting incidents—a process which failed and has apparently changed in the years since. Harrison testified that store manager Wright submitted a video request form to Sedgwick, and claim notes from Sedgwick indicate that a claim was indeed started on December 23, 2020. *See* Dkt. 78-9 at 1. While the notes show several communications to Kroger requesting video evidence, *see* Dkt. 78-9 at 10-16, the notes also indicate that Kroger employees discovered "there is no video where this occurred" while conceding that they "still need to secure video of the closest camera." Dkt. 78-9 at 8. In turn, Kroger loss prevention employees did capture some video footage of the general dairy area—but they captured the wrong timeframe: 12 hours earlier. While it is not reasonable for the employees to have assumed they should capture 10:00am instead of 10:00pm based on Trudy Keefe's pattern of working day shifts, not night shifts, this fallible assumption and the loss that resulted is not the type of culpable *mens rea* evidence that warrants greater sanctions under Rule 37(e)(2), without more.

Accordingly, upon finding prejudice to Whitmore from loss of the video footage but no foul intent, the Court must "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).

Considering the equities, the Court will instruct the jury at trial that it *may* presume that the lost video footage was unfavorable to Kroger.

### B. Deceptive Conduct

Whitmore next argues for an even greater regime of sanctions—contending that the Court

17

should invoke its inherent authority to sanction litigants for deceptive conduct and grant Whitmore default judgment against Kroger. Whitmore argues that "Kroger has been materially misrepresenting facts to Plaintiff, under oath, for the duration of litigation." *See* Dkt. 78 at 14. Whitmore makes this argument on the basis that, from the beginning, Kroger asserted and maintained a legal and factual position that Whitmore's "cart or buggy, whatever it was, was never struck by a pallet of milk maneuvered by an employee." Dkt. 78-3 at 5.

Yet, as Whitmore points out, claim notes between Sedgwick and Kroger suggest that Kroger knew from the beginning that contact had indeed occurred between a store pallet and Whitmore's cart. The claim notes indicate that on December 23, 2020, Sedgwick and a Kroger management employee discussed the alleged incident over the telephone, apparently as a part of a claims intake process. *See* Dkt. 78-9 at 19. The Sedgwick-produced record states that the "caller said that [employee] said that **it's true that the jack hit the buggy** but the buggy was no where near the [claimant]." Dkt. 78-9 at 19. This call occurred well before litigation began, such that, if Kroger and Kroger's counsel were on notice about this admission, Kroger never should have taken its subsequent position disputing that contact occurred with Whitmore's "buggy," without some further reason to discredit the prior admission.

The Court, however, remains "[m]indful of the strong policy that cases be decided on the merits, and that dismissal without deciding the merits is the most extreme sanction." *Shaffer Equipment*, 11 F.3d at 462-63. The Court considers the following factors:

> (1) the degree of the wrongdoer's culpability;
> (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients;
> (3) the prejudice to the judicial process and the administration of justice;
> (4) the prejudice to the victim;
> (5) the availability of other sanctions to rectify the wrong by

>    punishing culpable persons, compensating harmed persons, and
>    deterring similar conduct in the future; and
> (6) the public interest.

*Shaffer Equipment*, 11 F.3d at 462-63.

Here, the Court simply lacks sufficient evidence to find that the discrepancy between Kroger's legal position and the Sedgwick claim note constitutes fraud upon the Court. While Kroger is not "blameless," neither is Kroger clearly or severely culpable. The Court cannot eliminate the possibility that the claim note (and the apparent admission of physical contact it represents) was simply a bungled or imprecise communication, not an admission of fact that Kroger later tried to walk back or bury. And even if it were an admission of fact, the Court cannot conclude that Kroger's various employees, who may or may not have been on notice of this admission, committed fraud upon the Court by maintaining a contrary position in their depositions. Similarly, the Court cannot conclude that Kroger's counsel so instructed them to maintain such a position. Instead of fraud, the claim note and its apparent admission of fact constitute material ripe for witness impeachment and cross-examination—not the "most extreme sanction" of default judgment.

## IV. Conclusion

In an order that will accompany this memorandum opinion, and for the reasons stated above, the Court will **GRANT** Plaintiff Whitmore's Motion for Sanctions, **Dkt. 77,** to the extent that the Court will instruct the jury at trial that it may presume the lost evidence was unfavorable to Defendant Kroger. The Court **DENIES** Plaintiff's motion to the extent that it requests greater sanctions.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to the parties.

Entered this 6th day of December, 2024.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE